UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
UNITED STATES OF AMERICA,        :

                    :

     -against-          :

                    :         **REPORT AND**

RICHARD ANTHONY NELSON,    :     **RECOMMENDATION**

                    :

     Defendant.        :    20 Crim. 353 (BMC) (VMS)

                    :
------------------------------------------------------------ x

**Vera M. Scanlon, United States Magistrate Judge:**

Defendant Richard Anthony Nelson ("Defendant") is charged with illegal reentry after one or more convictions for the commission of an aggravated felony in violation of 8 U.S.C. §§ 1326(a) and (b)(2). See ECF Nos. 1, 8. The Honorable Brian M. Cogan referred this case to the undersigned for all pretrial matters. Defendant moved to suppress evidence. See ECF No. 30. The United States of America (the "Government") opposed the motion. See ECF No. 33. Defendant replied. See ECF No. 38. After the Court heard the parties' arguments, the parties submitted supplemental briefing. See ECF Nos. 46-47, 49-50, 53-55. For the reasons discussed below, I respectfully recommend that the District Court deny Defendant's motion.

I.   **Background**

   a.  **The Affidavit And Complaint In Support Of An Arrest Warrant**

As alleged in an affidavit and complaint in support of an arrest warrant dated August 5, 2019, Defendant is a citizen of Jamaica. See ECF No. 1. Defendant entered the United States as a lawful permanent resident on or about March 5, 1986. See id. Between 1992 and 2005, Defendant was convicted of certain criminal offenses, including Attempted Criminal Sale of a Controlled Substance in the Third Degree, in violation of New York Penal Law Section 220.39(1), and Felon in Possession of Firearm and Ammunition, in violation of Title 18, United

States Code, Section 922(g).  See id.  On February 21, 2008, Defendant was removed to Jamaica pursuant to a removal order entered by an Immigration Judge on or about December 20, 2007. See id. ¶ 3.

On June 22, 2019, a confidential source ("CS") known to the United States Marshals Service notified law enforcement agents that Defendant was in Brooklyn, New York, having entered the United States from Jamaica after having been previously deported from the United States.  See id. ¶¶ 4-5.  The CS provided law enforcement agents with an open-source social media page for "Richie Tek," and agents determined that "Richie Tek's" appearance matched Defendant's appearance by comparing photographs from "Richie Tek's" social media site with photographs of Defendant.  See id. ¶ 6.  "Richie Tek" made social media posts referencing his deceased daughter by name.  See id. ¶ 7.  A law enforcement record search identified a female with the name "Richie Tek's" posts mentioned, whose father's name matched Defendant's name. See id.  "Richie Tek's" date of birth also matched that of Defendant.  See id.  A search of federal immigration records revealed that Defendant had not requested permission from either the United States Attorney General or the Secretary of the Department of Homeland Security to re-enter the United States after removal.  See id. ¶ 8.

In connection with the above allegations made in the complaint, the Government requested that an arrest warrant be issued for Defendant.  See id. at 4.  An arrest warrant issued on August 5, 2019.  See ECF No. 2.  As relevant here, Defendant does not contest the validity of the arrest warrant.  See 7/15/2022 Tr. at 11:25-12:2, ECF No. 55.

**b.  The Search Warrant**

On or about August 7, 2020, the Government applied pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(c)(1)(A) for a search warrant requiring the

cellular telephone service provider T-Mobile US, Inc. ("T-Mobile") to search the cellular telephone assigned to a call number ending in 3681 (the "Target 3681 Cell Phone") for historical cell site location information ("CSLI") for the time period of July 7, 2020, to August 7, 2020, and for thirty days of prospective CSLI and other location data, and to disclose it to the Government (the "Search Warrant").  See Search Warrant Aff., ECF No. 30-2.[1]

According to the Search Warrant affidavit, there was probable cause to believe that Defendant was using the Target 3681 Cell Phone based on its patterns of usage.  See id.  In support of this belief, the affiant provided the following information:

Toll records for a telephone number ending in 6138 (the "6138 Number"), which was subscribed in the name of Defendant's daughter who, according to public records was deceased, showed a pattern of calls and text messages indicating that numerous telephone calls and text messages were made to a telephone number ending in 1128 (the "1128 Number").  See id. ¶ 16. The 1128 Number was subscribed in the name of an individual with whom Defendant was believed to be romantically involved ("Individual 1").  See id.  Publicly available photographs posted on social media showed Defendant and Individual 1 together, and records obtained from Facebook showed that Defendant accessed his Facebook account from an Internet Protocol ("IP") address associated with Individual 1.  See id.  Toll records for the 6138 Number also showed that it made or retrieved numerous telephone calls and text messages to telephone numbers associated with Defendant's mother, brother and friend.  See id. ¶ 17.

---

[1] The Government sought and received a second search warrant dated August 17, 2020, which requested collection of location data for the Target 3681 Cell Phone through the use of a Stingray or other cell site simulator.  See Def. Ex. B, Application and Search Warrant dated August 17, 2020, ECF No. 30-3.  The Government states that this search warrant was never executed, and no cell site simulator or device was ever deployed.  See ECF No. 28 at 5; ECF No. 33 at 9 n.2.  This search warrant is not the subject of Defendant's instant motion.

T-Mobile records showed that at the time of the Search Warrant application, the 6138 Number had recently been reassigned to another customer.  See id. ¶ 18.  On or about June 27, 2020, the Target 3681 Cell Phone was activated in the name of subscriber "Lamont Waugh" at an address in Brooklyn, New York.  See id. ¶ 19.  "Waugh is a common surname in [Defendant]'s family, and the Brooklyn address provided to T-Mobile is not a real address."  See id. (internal quotation marks omitted).

T-Mobile records showed that the 6138 Number and the Target 3681 Cell Phone had exchanged telephone calls and text messages with multiple telephone numbers in common.  See id. ¶ 20.  For instance, between July 7, 2020, and August 5, 2020, the Target 3681 Cell Phone exchanged approximately 436 telephone calls with Individual 1's 1128 Number, which made up approximately 16.24% of all telephone calls the Target 3681 Cell Phone made or received during that period.  See id.  The Target 3681 Cell Phone also exchanged telephone calls and text messages with Defendant's mother, brother and friend during the same time period.  See id.

Based on this pattern of common calls and the affiant's training and experience, the affiant believed that Defendant had used both the 6138 Number and the Target 3681 Cell Phone. See id.  The affidavit sets forth that "there is probable cause to believe that [Defendant], also known as 'Richie Tek,' has violated Title 18, United States Code, Section 1326(b)(2) (illegal reentry)," and that the location data pertaining to the Target 3681 Cell Phone will "assist law enforcement in arresting [Defendant], who is a 'person to be arrested' within the meaning of Federal Rule of Criminal Procedure 41(c)(4)."  See id. ¶ 5.  The warrant sought historical CSLI for the period of July 7, 2020, to August 7, 2020, and 30 days of prospective location data, including both CSLI and E-911 Phase II data.  See Search Warrant Aff. Attach. B at 1-2, ECF No. 30-2.  The affidavit explains that E-911 Phase II data, also known as "GPS data" or

4

"latitude-longitude data" provides "relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers." See id. ¶ 23. Cell-site data provides "typically less precise" location information by identifying the cell tower that received a radio signal from the cell phone. See id. The affidavit explains that the "historical cell-site information will allow law enforcement officers to identify any recent patterns of behavior showing [Defendant's] common locations, which will assist law enforcement to locate and arrest [Defendant]." See id. ¶ 22.

The Government attached the arrest warrant to the Search Warrant application. See ECF No. 30-2 at 22. On the "Application for A Search Warrant" form accompanying the warrant affidavit, in the section for "[t]he basis for the search under Fed. R. Crim. P. 41(c)," the Government checked the box next to "a person to be arrested or a person who is unlawfully restrained." See ECF No. 33-1 at 2. The Court granted the Government's application and issued the Search Warrant. See ECF No. 30-2 at 1.

### c.  Defendant's Arrest

Eleven days after the Search Warrant issued, government agents arrested Defendant at 113-37 205th Street, Queens, New York 11412, where he resided with his girlfriend, Rhoda Ricketts. See Def. Ex. C, Form I-213, ECF No. 30-4; Def. Ex. D, Ricketts Decl., ECF No. 30-5. Ms. Ricketts was present during the arrest. See generally Ricketts Decl. According to Ms. Ricketts, officers arrived at around 6:00 a.m. and informed her that they had an arrest warrant for Defendant. See id. ¶¶ 3-6. Approximately ten law enforcement officers, including "ICE/ERO.ECPT members, USMS NY/NJ RFTF members and DEA NY Special Agents," entered her home. See Form I-213; Ricketts Decl. ¶ 9. Officers went upstairs, where they

discovered Defendant in a bedroom.  Ricketts Decl. ¶ 11. They also went into the basement, where Ms. Ricketts's mother and daughter were sleeping.  Id. ¶ 12.[2]

After arresting Defendant, officers asked him autobiographical questions, including his name, date of birth, social security number and place of birth, which he answered.  See Defendant's Memorandum of Law in Support of His Motion to Suppress ("Def. Memo.") at 7, ECF No. 30; Form I-213.  The Court will hereinafter refer to this information as Defendant's "pedigree information."  The officers also inquired about Defendant's knowledge of other crimes, asked him to cooperate with them against suspected criminals, and they prepared a DEA "consent to search" form authorizing a search of the home.  See Def. Memo. at 7; Def. Ex. E, Consent to Search Form, ECF No. 30-6.  Although Defendant "does not concede that he consented to any search" (Def. Memo. at 7 n.5), the record contains an executed consent to search form.[3]  See Consent to Search Form.  Defendant claims that the officers searched the home with a police canine, both in the bedroom where they apprehended Defendant, and in other areas.  Ricketts Decl. ¶¶ 14-15; Consent to Search Form.  According to Defendant, the officers did not seize any property from the home.  See 7/15/2022 Tr. at 3:14-18, 5:2-10, 13:8-9.

Defendant made his initial appearance and was released on bond.  See 8/18/2020 Minute Entry.  The Government timely filed an indictment charging Defendant with illegal reentry in

---

[2] The Ricketts Declaration describes Defendant's arrest and the search of her residence incident to the arrest.  See generally Def. Ex. D.  The instant motion does not challenge the validity of that search.  As discussed infra, Defendant submits information regarding this search as evidence that law enforcement sought the Search Warrant not just to effect Defendant's arrest for illegal reentry, but also to investigate whether Defendant had committed other offenses.

[3] It is unclear who signed the form. See id.

violation of 8 U.S.C. §§ 1326(a) and (b)(2).  See Indictment, ECF No. 8.[4]  The case was referred

to this Court for pretrial matters.

### d.  Defendant's Motion To Suppress

Defendant seeks to suppress identity-related statements that he made to law enforcement

agents who "interrogated him" at the time of his arrest, i.e., his pedigree information.  See Def.

Memo. at 7; 7/15/2022 Tr. at 5:2-7.  Agents recorded Defendant's pedigree statements on an I-

213 Record of Deportable/Inadmissible Alien.  See Form I-213.  Defendant seeks to suppress his

pedigree information because "the nature of the [illegal reentry] charge . . . will largely hinge on

the [G]overnment's ability to match [Defendant's] identity to the immigration records for

[Defendant] that they believe established that he was previously deported."  7/15/2022 Tr. at

6:15-21.  The Government opposed.  See ECF No. 33.  Plaintiff replied.  See ECF No. 38.  The

Court heard the parties' arguments, and the parties supplemented the record.  See ECF Nos. 46-

47, 49-50, 53-55; Dkt. Entry 9/22/2022.

Defendant argues that the Search Warrant lacked probable cause because the affidavit

"made no claim that evidence of any crime was being sought after" and "the sole purpose of the

location data was to assist in executing the arrest warrant."  See Def. Memo. at 11.  He argues

that the warrant was overbroad and lacked particularity because it enabled the Government to

track his location for an unreasonable time period and because it permitted the Government to

obtain both historical and real-time location data.  Id. at 12.  He argues that the Search Warrant

---

[4] Defendant also filed a motion to dismiss the indictment, which the Government opposed.  See
ECF Nos. 31, 34.  Defendant's two motions were set on the same briefing schedule and intended
to be considered simultaneously by the Court.  See ECF No. 26.  The briefing schedule for
Defendant's motion to dismiss was extended, due to anticipated discovery from the Government.
See ECF No. 36; Order dated 12/29/2021; ECF Nos. 39-41; Order dated 1/20/2022.  After the
Government produced discovery, Defendant withdrew his motion to dismiss such that only
Defendant's motion to suppress remains pending before the Court.  See ECF No. 42.

affidavit made material omissions, in that it failed to disclose the "source by which Mr. Nelson's 6138 phone number and [the Target 3681 Cell Phone] was [sic] obtained." Id. at 13.  He also argues that the good-faith exception to the exclusionary rule does not apply because the Search Warrant was facially deficient and "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. at 15.

The Government responds that the warrant was issued for a proper purpose because the Federal Rules of Criminal Procedure and Fourth Amendment permit authorization of search warrants to locate and apprehend arrest targets. See Government's Memorandum of Law in Opposition to Defendant's Motion to Suppress ("Gov. Opp.") at 8-12, ECF No. 33.  The Government argues that the affiant did not make any material omissions, and that the Search Warrant affidavit provided sufficient detail supporting the Government's belief that Defendant was using the Target 3681 Cell Phone. Id. at 14.  The Government argues that, even if the Search Warrant were invalid, the good-faith exception applies because there is no indication of deception or gross negligence by law enforcement. Id. at 19.  The Government concludes by saying that Defendant is not entitled to a hearing because he has failed to raise a factual issue to be resolved. Id.

## II.  Legal Standards

### a.  Privacy Rights And Standing

"Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (internal quotation marks & citations omitted). "The cornerstone of the modern law of searches is the principle that, to mount a successful Fourth Amendment challenge, a defendant must demonstrate that he personally has an expectation of privacy in the place searched." United States v. Haqq, 278 F.3d 44, 47 (2d Cir.

2002) (internal quotation marks & citations omitted). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas, 439 U.S. at 134 (citing Alderman v. United States, 394 U.S. 165, 174 (1969)). "And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." Id. (internal citations omitted).

A defendant seeking suppression bears the burden of establishing standing. United States v. Pena, 961 F.2d 333, 336 (2d Cir. 1992). "It is well established that in order to challenge a search, a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search." United States v. Ruggiero, 824 F. Supp. 379, 391 (S.D.N.Y. 1993) (citations omitted), aff'd sub nom. United States v. Aulicino, 44 F.3d 1102 (2d Cir. 1995); see United States v. Dore, 586 F. App'x 42, 46 (2d Cir. 2014) (holding that the defendant lacked standing to assert Fourth Amendment rights in phone records where he "did not submit an affidavit establishing that the cell phones in question belonged to him or that he had a subjective expectation of privacy in them," or in any other manner); United States v. Lucas, 382 F. Supp. 3d 280, 284 (W.D.N.Y. 2019) (denying motion to suppress where the defendant failed to satisfy his burden of demonstrating a subjective privacy interest in a phone registered to another person); United States v. Montoya-Echevarria, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) ("The law is clear that the burden on the defendant to establish standing is met only by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge."); see also State v. Armadore, 258 A.3d 601, 624 (Conn. 2021) (noting that "federal

9

courts consistently have held that a defendant may not raise a <u>Carpenter</u> claim concerning historical CSLI of a third party unless he can establish his own reasonable expectation of privacy in the cell phone") (collecting cases)).  "Absent such a demonstration, the defendant lacks standing to challenge the search, and, therefore, the remedy provided by the exclusionary rule is unavailable."  <u>United States v. Lauria</u>, No. 19-CR-449-01 (NSR), 2020 U.S. Dist. LEXIS 176869, at *14 (S.D.N.Y. Sep. 24, 2020) (citing <u>Rakas</u>, 439 U.S. at 134); <u>see</u> Fed. R. Crim. P. 47(d).

Asserting an expectation of privacy does not automatically implicate the Fourth Amendment.  A court must ask whether society is willing to recognize the expectation as reasonable.  <u>See</u> <u>Carpenter v. United States</u>, 138 S. Ct. 2206, 2213 (2018); <u>California v. Ciraolo</u>, 476 U.S. 207, 211 (1986); <u>Katz v. United States</u>, 389 U.S. 347, 360 (1967) (Harlan, J, concurring).  "The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations."  <u>Grady v. North Carolina</u>, 575 U.S. 306, 310 (2015); <u>see, e.g.</u>, <u>Samson v. California</u>, 547 U.S. 843, 848 (2006).  "The ultimate question, therefore, is whether one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances."  <u>Rakas</u>, 439 U.S. at 152.

Standing to challenge a search "is more properly subsumed under substantive Fourth Amendment doctrine" than Article III standing doctrine.  <u>Id.</u> at 139.  This is because Fourth Amendment standing is not a jurisdictional question; it is fundamental to the determination of whether a Fourth Amendment violation occurred.  <u>See id.</u>; <u>Byrd v. United States</u>, 138 S. Ct. 1518, 1530-31 (2018) ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment

10

interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits.").

A defendant who establishes a possessory interest in a searched cell phone during the relevant time period has standing to challenge a search for location data associated with that cell phone.  See, e.g., Lauria, 2020 U.S. Dist. LEXIS 176869, at *16-18 (finding that defendants established standing through submission of affidavits or affirmations where they "alleged a possessory interest in the iPhones and data at the relevant times for those searches"); United States v. Ray, 541 F. Supp. 3d 355, 379-80 (S.D.N.Y. 2021) (finding declaration that the defendant owned one of the subject phones, and that the phone was registered to him, sufficient to carry the defendant's burden, but insufficient to establish a "legitimate expectation of privacy with respect to the other two cellphones" about which the affidavit was silent); United States v. Valdez, No. 20-CR-115 (ALC), 2021 U.S. Dist. LEXIS 68486, at *4 n.1 (S.D.N.Y. Apr. 7, 2021), as amended (S.D.N.Y. Apr. 9, 2021) (finding defendant's affidavit affirming he is the subscriber and exclusive possessor of the target phones sufficient to carry his burden to show standing to contest a warrant); United States v. Herron, 2 F. Supp. 3d 391, 400-01 (E.D.N.Y. 2014) (holding that defendant had a legitimate expectation of privacy in a cell phone registered to another individual where he provided an affidavit stating that he was the sole and exclusive user of that cell phone).

A failure to show a possessory interest may require denial of a motion to suppress.  See Dore, 586 F. App'x at 46 (holding that the defendant lacked standing to assert Fourth Amendment rights in phone records because he "did not submit an affidavit establishing that the cell phones in question belonged to him or that he had a subjective expectation of privacy in

them"); United States v. Walker, No. 16-CR-567 (JSR), 2017 U.S. Dist. LEXIS 38102, at *7 (S.D.N.Y. Mar. 8, 2017) (affidavit from the defendant stating that he used the target cell phone "on occasion" insufficient to establish standing because "[a]t most, the defendant has demonstrated non-exclusive and sporadic use" of the target cell phone); United States v. Serrano, 2014 U.S. Dist. LEXIS 81478, at *18-19 (S.D.N.Y. June 10, 2014) (denying motion to suppress due to lack of standing to challenge cell site evidence where "[t]he defendant has not proffered an affidavit that he has a privacy interest in that phone or the data on that phone").

### b. Probable Cause

Federal Rule of Criminal Procedure 41(c) provides that a warrant may be issued for "(1) evidence of a crime; (2) contraband, fruits of a crime, or other items illegally possessed; (3) property designed for use, intended for us, or used in committing a crime; or (4) a person to be arrested or a person who is unlawfully restrained." Fed. R. Crim. P. 41(c). Rule 41(c)(4) "covers a defendant or witness for whom an arrest warrant has theretofore issued, or a defendant for whom grounds to arrest exist even though no arrest warrant has theretofore issued." 1979 Adv. Comm. Notes to Fed. R. Crim. P. 41; see In re Smartphone Geolocation Data Application, 977 F. Supp. 2d 129, 137 (E.D.N.Y. 2013) (upholding search warrant for prospective geolocation data sought to facilitate apprehension of a defendant); see also Fed. R. Crim. P. 41, 1979 Adv. Comm. Notes ("It also covers the arrest of a deportable alien under 8 U.S.C. § 1252, whose presence at a certain place might be important evidence of criminal conduct by another person, such as the harboring of undocumented aliens under 8 U.S.C. § 1324(a)(3).").

A court may not issue a warrant absent probable cause. See Kentucky v. King, 131 S. Ct. 1849, 1856 (2011). "Probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." Warden v. Hayden, 387

U.S. 294, 307 (1967).  When reviewing a challenged warrant, a court accords "considerable deference" to the issuing magistrate judge's probable cause determination because "[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." United States v. Thomas, 788 F.3d 345, 350 (2d Cir. 2015) (citation & internal quotation omitted); see Gates, 462 U.S. at 236; United States v. Vasquez, 634 F.2d 41, 45 (2d Cir. 1980) ("The determinations made by a neutral magistrate and district judge that probable cause existed to issue a search warrant are accorded great deference and any doubts should be resolved in favor of upholding the warrant.") (citation & internal quotations omitted).  "Accordingly, the task of a reviewing court is simply to ensure that the totality of the circumstances afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." Thomas, 788 F.3d at 350 (quoting Gates, 462 U.S. at 238).

Cell phone location data can aid criminal investigations by assisting law enforcement in developing a group of suspects, see United States v. Morris, No. 20-CR-100-RJA-JJM, 2022 U.S. Dist. LEXIS 93273, at *30 (W.D.N.Y. Apr. 12, 2022), determining a suspect's location and movements at the time a crime occurred, see United States v. Todaro, No. 16-CR-347-2 (RJD), 2020 U.S. Dist. LEXIS 209376, at *4 (E.D.N.Y. Nov. 9, 2020), or tracking a suspect's present location to facilitate his apprehension and arrest, see Cutts v. Miller, No. 19-CV-10721 (LJL), 2021 U.S. Dist. LEXIS 13390, at *16 (S.D.N.Y. Jan. 25, 2021).  In 2018, the Supreme Court in Carpenter held that law enforcement's acquisition of historical CSLI for a period of 127 days constituted a Fourth Amendment search, and that "the Government must generally obtain a warrant supported by probable cause before acquiring such records" from a wireless carrier. Carpenter, 138 S. Ct. at 2220.  Carpenter is silent on whether collection of real-time or

prospective location data implicates the Fourth Amendment.  See Jackson v. Kirkpatrick, No. 16-CV-3973 (JFB), 2019 U.S. Dist. LEXIS 2623, at *37 (E.D.N.Y. Jan. 4, 2019).  Although the Second Circuit has not ruled on the issue, courts in other circuits have declined to categorically extend Carpenter to real-time location data.  See, e.g., United States v. Hammond, 996 F.3d 374, 392 (7th Cir. 2021) (use of real-time CSLI to locate and apprehend a defendant for whom there was probable cause to arrest did not amount to a Fourth Amendment search); United States v. Green, 981 F.3d 945, 958 (11th Cir. 2020) ("The question of whether acquiring [real-time location data] constitutes a search was unanswered in 2013 and remains unanswered today."); United States v. Washington, No. 1:17-CR-00084-RJS-DBP, 2022 U.S. Dist. LEXIS 54160, at *20 (D. Utah Mar. 24, 2022) (declining to "reach the issue of whether Carpenter's holding should be expanded to real-time CSLI acquisition because the good faith exception would apply either way."); but see United States v. Lambis, 197 F. Supp. 3d 606, 611 (S.D.N.Y. 2016) (use of a cell-site simulator—which tracks a cell phone's location more precisely than CSLI—is a Fourth Amendment search that requires a warrant).  The Court need not resolve this issue today because, here, the Government had a valid search warrant, as discussed infra, such that any Fourth Amendment rights, to the extent they exist, were protected.

Courts have affirmed the validity of search warrants for both historical and real-time location data for the purpose of locating and apprehending an arrest target.  See, e.g., United States v. Sosunov, No. 17-CR-350 (KBF), 2018 U.S. Dist. LEXIS 76796, at *40 (S.D.N.Y. May 7, 2018) (upholding search warrant for 18 months of historical CSLI and 45 days of prospective E-911 Phase II data for cell phone believed to be used by subject of arrest warrant); In re Smartphone, 977 F. Supp. 2d at 137 (upholding search warrant for real-time geolocation data to aid in the apprehension of defendant with open arrest warrant); United States v. Ennis, No. 21-

1093, 2022 U.S. App. LEXIS 8779, at *7 (6th Cir. Mar. 31, 2022) (upholding search warrant for

43 days of real-time CSLI to track defendant with two open arrest warrants); Grant, 2021 U.S.

Dist. LEXIS 205050 at *19 (upholding phone tracking warrant for 45 days of historical CSLI

and 45 days of prospective CSLI to locate subject of open arrest warrant); People v. Cutts, 88

N.Y.S.3d 332, 333 (N.Y. Sup. Ct., N.Y. Cnty. Nov. 7, 2018) (finding probable cause for order

authorizing collection of historical and real-time CSLI, which was used to locate and arrest the

defendant); People v. Davis, 149 N.Y.S.3d 794, 803 (N.Y. Sup. Ct., Bronx Cnty. May 17, 2021)

(holding that a CSLI search warrant used "solely for the purpose of finding and arresting a

suspect" can be valid).

### c.  Particularity And Overbreadth

The Fourth Amendment requires a search warrant's scope to be "set out with

particularity."  King, 563 U.S. at 459 (2011).  "To satisfy the Fourth Amendment's particularity

requirement, a warrant must meet three criteria: (1) it 'must identify the specific offense for

which the police have established probable cause'; (2) it 'must describe the place to be

searched'; and (3) it 'must specify the items to be seized by their relation to designated crimes.'"

United States v. Purcell, 967 F.3d 159, 178 (2d Cir. 2020) (quoting United States v. Galpin, 720

F.3d 436, 445 (2d Cir. 2013)).  "Search warrants covering digital data may contain some

ambiguity so long as law enforcement agents have done the best that could reasonably be

expected under the circumstances, have acquired all the descriptive facts which a reasonable

investigation could be expected to cover, and have insured that all those facts were included in

the warrant."  Ray, 541 F. Supp. 3d at 398.

"[B]readth and particularity are related but distinct concepts."  Purcell, 967 F.3d at 179

(citation omitted).  "[A]n otherwise unobjectionable description of the objects to be seized is

defective if it is broader than can be justified by the probable cause upon which the warrant is based." Id. (quoting Galpin, 720 F.3d at 446); see Ray, 541 F. Supp. 3d at 398 ("A warrant must be limited in its breadth such that the seizure does not include items 'broader than can be justified by the probable cause upon which the warrant is based.'") (quoting Galpin, 720 F.3d at 446). "Although a lack of particularity can result in a warrant's overbreadth, a broad warrant does not necessarily lack particularity." Ray, 541 F. Supp. 3d at 398 (citation omitted). "To determine whether a warrant is overbroad, courts look to whether there exists probable cause to support the breadth of the search that was authorized." Id. (quotation omitted). "As is the case with challenges to the validity of search warrants generally, a defendant bears the burden of showing that a search warrant is overbroad." United States v. Daprato, No. 2:21-CR-00015-JDL-4, 2022 U.S. Dist. LEXIS 78626, at *15-16 (D. Me. May 2, 2022) (citation & quotation omitted).

The Constitution does not permit pretextual use of a search warrant to perform a broader search than the warrant authorizes. See Horton v. California, 496 U.S. 128, 140 (1990). Where an overly broad search does not lead to seizure of evidence, however, suppression is not an appropriate remedy. See United States v. Moran, No. 11-CR-6083CJS, 2014 U.S. Dist. LEXIS 179207, at *19 (W.D.N.Y. Dec. 24, 2014), report & recommendation adopted, 2015 U.S. Dist. LEXIS 18116 (W.D.N.Y. Feb. 13, 2015) (despite use of drug-sniffing dogs to conduct a broader search than search warrant authorized, suppression was not appropriate where there was no widespread seizure of evidence outside the scope of the warrant).

In support of his argument that the Search Warrant was overbroad and lacked particularity, Defendant cites United States v. Oglesby, No. 4:18- CR-0626, 2019 U.S. Dist. LEXIS 71238 (S.D. Tex. Apr. 26, 2019), for its holding that a search warrant obtained after the

defendant's arrest for vehicle burglary failed to establish a nexus between the defendant's phone and evidence sought relating to the defendant's arrest.  In Oglesby, the court found that there was no nexus between the defendant's phone and evidence pertaining to the defendant's arrest because the warrant did not contain cause to believe that evidence of the vehicle burglary would be found on the phone.  See id. at *20-27.

### d.  Post-Arrest Statements And The Exclusionary Rule

Under the exclusionary rule, post-arrest statements may be excluded from evidence as "fruit of the poisonous tree" where an unconstitutional search has occurred.  Wong Sun v. United States, 371 U.S. 471, 485-86 (1963); see United States v. Vasquez, 638 F.2d 507, 527 (2d Cir. 1980) (holding that because an entry and arrest were unlawful, the defendant's "post arrest statements must be suppressed"); United States v. Morris, No. 07-CR-29 (NG) (JO), 2007 U.S. Dist. LEXIS 104248, at *23-24 (E.D.N.Y. Oct. 31, 2007), report and recommendation adopted, 2007 U.S. Dist. LEXIS 91383 (E.D.N.Y. Dec. 11, 2007) (due to unlawful stop, the exclusionary rule required suppression "not only of the gun that [the officer] discovered . . . but also of [the defendant's] later admission that the gun was his").  Even where a search warrant is constitutionally defective, however, "[s]uppression of evidence . . . has always been [a] last resort, not [a] first impulse."  Hudson v. Michigan, 547 U.S. 586, 591 (2006).

The exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations."  Davis v. United States, 564 U.S. 229, 236-37 (2011).  "Real deterrent value" is a prerequisite to exclusion, but is not alone sufficient—the analysis must also account for "substantial social costs" of exclusion.  Id. at 237 (citing Hudson, 547 U.S. at 596, and United States v. Leon, 468 U.S. 897, 907 (1984)).  This cost-benefit analysis focuses on the "'flagrancy of the police misconduct' at issue."  Davis, 564 U.S. at 238 (quoting Leon, 468 U.S. at 909, 911).

Where officers "act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." Davis, 564 U.S. at 238 (internal citations & quotation marks omitted). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 144 (2009).

Certain exceptions to the exclusionary rule may prevent suppression. Under the attenuation doctrine exception, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 579 U.S. 232, 238 (2016) (quoting Hudson, 547 U. S. at 591). Application of the attenuation doctrine depends on three factors: first, "temporal proximity between the unconstitutional conduct and the discovery of evidence"; second, "the presence of intervening circumstances"; third, and "particularly significant," the "purpose and flagrancy of the official misconduct." Strieff, 579 U.S. at 238 (citing Brown v. Illinois, 422 U. S. 590, 603 (1975)) (internal quotation marks omitted). In Strieff, the Supreme Court held that a pre-existing valid arrest warrant "broke the casual chain" between an unlawful stop and discovery of evidence such that suppression was not appropriate. Strieff, 579 U.S. at 239. The Strieff Court held that, although the temporal proximity factor weighed in favor of suppression (the police officer discovered drug contraband mere minutes after illegally stopping the defendant), application of the other two factors rendered suppression inappropriate. Id. at 239-41. The existence of a valid arrest warrant that predated

the unlawful stop weighed strongly against suppression under the second factor.  Id. at 240.  The

defendant's arrest was a "ministerial act that was independently compelled by the pre-existing

arrest warrant," and it was "undisputedly lawful" to search the defendant incident to the arrest.

Id. at 240-41.  Finally, the third factor weighed against suppression because the officer was "at

most negligent" in stopping the defendant.  Id. at 241.

 A defendant's statements taken pursuant to a valid arrest after an unlawful search may

be admissible where there was independent probable cause to arrest.  For example, in New York

v. Harris, 495 U.S. 14 (1990), which involved the defendant's valid arrest during law

enforcement's warrantless entry into his home without his consent, the Supreme Court ruled that

"where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the

State's use of a statement made by the defendant outside of his home, even though the statement

is taken after an arrest made in the home in violation of [the Fourth Amendment]."  The

defendant's stationhouse statement was admissible "because [the defendant] was in legal custody

. . . and because the statement, while the product of an arrest and being in custody, was not the

fruit of the fact that the arrest was made in the house rather than someplace else."  Id. at 20.  "To

put the matter another way, suppressing the statement taken outside the house would not serve

the purpose of the rule that made [the defendant's warrantless] in-house arrest illegal."  Id.

"Given that the police have probable cause to arrest a suspect in [the defendant's] position, they

need not violate [the Fourth Amendment] in order to interrogate the suspect."  Id. at 20-21.

 The good-faith exception to the exclusionary rule applies when an "officer's reliance on

the magistrate's probable-cause determination and on the technical sufficiency of the warrant he

issues" was objectively reasonable.  Leon, 468 U.S. at 922-23 (1984) (setting forth situations in

which an officer's reliance on a warrant cannot be objectively reasonable).  Under the good-faith

exception, the burden is on the Government to show the objective reasonableness of the officers' good-faith reliance on an invalidated warrant. See United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011).

Under the inevitable-discovery exception to the exclusionary rule, unlawfully obtained evidence is admissible "if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." United States v. Stokes, 733 F.3d 438, 444 (2d Cir. 2013) (internal quotation marks omitted). For the inevitable-discovery exception to apply, the government must show by a preponderance of the evidence based on "demonstrated historical facts capable of ready verification or impeachment" that the defendant's statements would have been discovered but for the unconstitutional conduct. Id. (citations & internal quotations omitted).

The Government argues for a fourth exception to the exclusionary rule. It suggests that there is a categorical rule insulating all identity-related evidence from suppression. See Gov. Supp. Br., ECF No. 54. The Government relies on the Supreme Court's statement in Lopez Mendoza that the "'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." Immigration & Naturalization Serv. v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984). The Second Circuit has rejected the Government's line of reasoning in other cases. In Pretzantzin, the Court held that although identity information required to establish jurisdiction is not suppressible on a purely practical level, that principle is not a rule of evidence. See Pretzantzin v. Holder, 736 F.3d 641, 650 (2d Cir. 2013).[5]

---

[5] There is a similar but distinct line of cases considering pedigree arrest information in the Fifth Amendment and Miranda context. The "solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by Miranda[.]"

While identity evidence is not categorically shielded from suppression, it should not be suppressed where the purpose of the exclusionary rule would not be served.  For example, in United States v. Chagoya-Morales, 859 F.3d 411 (7th Cir. 2017), the defendant was charged with illegally reentering the country after deportation and sought to suppress "information related to his identity and his status as an illegal resident of the United States" based on an unlawful traffic stop.  Chagoya-Morales, 859 F.3d at 413-14.  The court held that, even if it were to adopt the minority position the Second Circuit took in Pretzantzin, suppression would be inappropriate because the defendant's illegal presence in the country could be determined outside of the traffic stop's context.  Id. at 419.  The Chagoya-Morales court took instruction from Hudson v. Michigan, where the Supreme Court held that "the exclusionary rule should be invoked 'only where its remedial objectives are thought most efficaciously served—that is, where its deterrence benefits outweigh its substantial social costs.'"  Chagoya-Morales, 859 F.3d at 419 (citing Hudson, 547 U.S. at 591).

---

United States v. Adegbite, 846 F.2d 834, 838-39 (2d Cir. 1988); see Rosa v. McCray, 396 F.3d 210, 221 (2d Cir. 2005) ("Whether the information gathered turns out to be incriminating in some respect does not, by itself, alter the general rule that pedigree questioning does not fall under the strictures of Miranda."); United States v. Robinson, No. 16-CV-545 (ADS) (AYS), 2017 WL 5135598, at *10 (E.D.N.Y. Nov. 1, 2017) ("As to the [d]efendant's statements about his pedigree information, it is clear from the case law that pedigree information is not something that can be suppressed, because a [d]efendant's identity cannot be suppressed, and because questions concerning pedigree do not amount to custodial interrogation.").  On the other hand, because the Miranda pedigree exception "is focused on protecting basic information needed to facilitate the booking and arraigning of a suspect from suppression as a result of a Miranda violation following a valid arrest, . . . [t]he concerns inherent within the pedigree exception to Miranda violations—supplying incriminating but identifying information without being warned of the consequences—do not line up well with the circumstances of [a defendant's Fourth Amendment] constitutional claim."  Pretzantzin, 736 F.3d at 649 n.8 (citations & internal quotations omitted).  "There is no reason to consider engrafting an exception to the protections of the Fifth Amendment onto [the defendant's] Fourth Amendment claims."  Id.  This is because, if taken out of context, the Miranda pedigree exception "could be read to suggest that random, widespread detentions and questioning of suspected aliens would not implicate Fourth Amendment rights."  United States v. Navarro-Diaz, 420 F.3d 581, 587 (6th Cir. 2005).

In Hudson, the Supreme Court declined to suppress identity evidence that officers obtained after violating the knock-and-announce rule. See Hudson, 547 U.S. at 601-02. The Supreme Court reasoned that suppression would not deter the conduct at issue, because officers violate the knock-and-announce rule "not to obtain evidence that is otherwise not obtainable, but to avoid unnecessary violence and ensure the preservation of evidence." Chagoya-Morales, 859 F.3d at 419; Hudson, 547 U.S. at 596. A defendant's pedigree information can be obtained without violating the Constitution, as "[t]he police can obtain both photographs and fingerprints without conducting a search under the Fourth Amendment." United States v. Farias-Gonzalez, 556 F.3d 1181, 1188 (11th Cir. 2009).

Allowing a defendant charged with illegal reentry to suppress his identity evidence would merely delay the inevitable, further diminishing any deterrent value. See United States v. Navarro-Diaz, 420 F.3d 581, 588 (6th Cir. 2005) ("Directing the district court to grant [the defendant]'s suppression motion . . . would not affect the ultimate outcome of the charge against him . . . . Because [the defendant] could simply be reindicted for the same offense, suppressing his identity would have little deterrent effect . . . ."). In Navarro-Diaz, the Sixth Circuit declined to suppress identity evidence where the record "reveal[ed] that [the defendant] was not accosted by the police in a random attempt to determine whether he was an illegal alien." Id. The Navarro-Diaz Court noted "a significant practical problem" with excluding the defendant's identity information, i.e., that the defendant was

> a person whose unregistered presence in this country, without more, constitutes a crime. His release within our borders would immediately subject him to criminal penalties. If his identity may be suppressed, the moment the court lets him go, he is immediately committing the continuing violation of being present in the United States after having been deported. The Supreme Court recognized this difficulty in Lopez-Mendoza, when it refused to suppress the alien's identity because, although the constable's blunder may allow the criminal to go free, the Court has

never suggested that it allows the criminal to continue the commission of an ongoing crime.

Directing the district court to grant [the defendant's] suppression motion, therefore, would not affect the ultimate outcome of the charge against him.  If the [G]overnment were forced to drop its prosecution of [the defendant], the police could simply approach him on his way out of the courtroom door and demand that he identity himself.

Id. at 587-88 (citations & internal quotations omitted).  In other words, where the defendant

"could simply be reindicted for the same offense," suppression would have little deterrent effect,

and it would be inappropriate regardless of whether police obtained the identity information in

violation of the Fourth Amendment.  Id. at 588.

### e.  **Franks** Hearing

Although "a search or seizure pursuant to a warrant is presumed valid," a defendant may,

"[i]n certain circumstances," request an evidentiary hearing pursuant to Franks v. Delaware, 438

U.S. 154 (1978), to "challenge the truthfulness of factual statements made in the affidavit, and

thereby undermine the validity of the warrant the resulting search or seizure."  United States v.

Awadallah, 349 F.3d 42, 64 (2d Cir. 2003).  To show entitlement to a Franks hearing on a

motion to suppress, a defendant must make a substantial preliminary showing that (1) the

warrant affidavit contained misstatements or omissions resulting from the "affiant's deliberate

falsehood or reckless disregard for the truth"; and (2) those misstatements or omissions were

material, or "necessary to the issuing judge's probable cause finding."  United States v.

Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013).  "To satisfy this test, a defendant must point out

specifically the portion of the warrant affidavit that is claimed to be false."  United States v.

Nejad, 436 F. Supp. 3d 707, 719 (S.D.N.Y. 2020) (citations & internal quotations omitted).

With respect to the intentionality prong, a defendant must present "credible and probative

evidence" that an omission "in a [warrant] application was 'designed to mislead' or was 'made in

reckless disregard of whether [it] would mislead.'" Id. (quoting Rajaratnam, 719 F.3d at 154).

"Where omissions are concerned, recklessness may be inferred 'where the omitted information was clearly critical to the probable cause determination.'" Nejad, 436 F. Supp. 3d at 719 (quoting Rivera, 938 F.2d at 604). Such an inference is "not to be automatically drawn simply because a reasonable person would have included the omitted information, and the inference is particularly inappropriate where the government comes forward with evidence indicating . . . that the omission was the result of a considered and reasonable judgment that the information was not necessary to the [warrant] application." Nejad, 436 F. Supp. 3d at 719 (quoting Rajaratnam, 719 F.3d at 154-55). "Understandably, the defendant's burden in showing intent is greater in the case of an omission because '[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.'" United States v. Lull, 824 F.3d 109, 115 (4th Cir. 2016) (quoting United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990)); see United States v. Lahey, 967 F. Supp. 2d 698, 708-09 (S.D.N.Y. 2013) ("[C]ourts evaluate motions under Franks to an exacting standard—especially where . . . a defendant primarily alleges that there are omissions, as opposed to misrepresentations, in the search warrant affidavit.").

With respect to the materiality prong, courts "gauge materiality by a process of subtraction" or addition depending on whether misstatements or omissions are at issue. Awadallah, 349 F.3d at 65. In other words, to determine materiality, courts should "insert the omitted truths," Rajaratnam, 719 F.3d at 146, and determine whether "there remains a residue of independent and lawful information sufficient to support probable cause." Awadallah, 349 F.3d at 65 (citation omitted). "If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause,

the district court need not conduct a Franks hearing." Nejad, 436 F. Supp. 3d at 719 (quoting

United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998).

The Franks standard is "a high one." Rivera, 928 F.2d at 604. To show entitlement to a

hearing, "a defendant must make a substantial preliminary showing of each of the prongs."

Nejad, 436 F. Supp. 3d at 719 (emphasis added, citations omitted). "Unsupported conclusory

allegations of falsehood or material omission cannot support a Franks challenge; to mandate a

hearing, the plaintiff must make specific allegations accompanied by an offer of proof. Velardi

v. Walsh, 40 F.3d 569, 573 (2d Cir. 1994); see United States v. Harun, 232 F. Supp. 3d 282, 285

(E.D.N.Y. 2017) (holding that a defendant who is moving to suppress evidence is not

automatically entitled to an evidentiary hearing, which "ordinarily is required if the moving

papers are sufficiently definite, detailed, and nonconjectural to enable a court to conclude that

there are contested issues of fact") (citations & internal quotations omitted); United States v.

Taylor, 672 F. Supp. 2d 539, 542 (S.D.N.Y. 2009) (finding that, because the defendant failed to

make a substantial showing under Franks, a probable cause analysis with the challenged portions

of the affidavit removed was unnecessary).

## III.    Discussion

This Court respectfully recommends that the District Court find that (1) Defendant has

established standing to challenge the Search Warrant because he has demonstrated a reasonable

expectation of privacy in the Target 3681 Cell Phone; (2) the Search Warrant was supported by

probable cause and was not overbroad or lacking in particularity because it was issued for a time-

limited set of location data for the lawful purpose of locating and apprehending Defendant, for

whom a valid arrest warrant had been issued; (3) even if the Search Warrant were invalid,

suppression would be inappropriate under the attenuation doctrine, because the pre-existing,

valid arrest warrant provided probable cause to obtain Defendant's pedigree information and

because the exclusionary rule's cost-benefit analysis weighs against suppression; (4) even if the

pedigree information was otherwise suppressible, it would be admissible under the good-faith

and inevitable-discovery exceptions; and (5) Defendant is not entitled to a Franks hearing

because Defendant failed to present sufficient evidence of any material omission in the Search

Warrant application.

### a.  Defendant Has Established Standing.

This Court respectfully recommends that the District Court find that Defendant had a

reasonable expectation of privacy in the Target 3681 Cell Phone.  Defendant initially submitted

an affidavit stating that he was the exclusive user of the Target 3681 Cell Phone for the period

covering the prospective location data, i.e., August 7, 2020, to August 18, 2020.  See ECF No.

46-1.  The Government argued that Defendant's affidavit failed to establish his privacy interest

in the Target 3681 Cell Phone for the period covering the historical location data, i.e., July 7,

2020, through August 7, 2020.  See ECF No. 47; ECF No. 49 at 7:1-3.  Defendant then filed a

supplemental affidavit stating that he was the exclusive user of the Target 3681 Cell Phone for

the period covering the retrospective and prospective location data that was the subject of the

Search Warrant, i.e., July 7, 2020, to August 7, 2020.  See ECF No. 50-1.  Defendant's affidavits

sufficiently demonstrate that he had an exclusive interest in this phone number during the time

period covered by the Search Warrant, i.e., July 7, 2020, through August 18, 2020.  See Lauria,

2020 U.S. Dist. LEXIS 176869, at *16-18 (finding defendants established standing through

submission of affidavits or affirmations where they "alleged a possessory interest in the iPhones

and data at the relevant times for those searches").

### b.  The Search Warrant Was Supported By Probable Cause.

This Court respectfully recommends that the District Court find that the Search Warrant

was supported by probable cause.  The supporting affidavit sets forth that there was an open

warrant for Defendant's arrest.  See Search Warrant Aff. ¶¶ 5, 14.  It explains how law enforcement became aware of the "Richie Tek" Facebook profile and how they connected it to Defendant.  Id. ¶¶ 10-12.  It sets forth that law enforcement ascertained the identity of Defendant's late daughter and determined that the 6138 Number cell phone was subscribed in her name and was being used to contact Defendant's family members and romantic partner.  Id. ¶¶ 12, 16-17.  It further explains that, after the 6138 Number was assigned to a different customer, the Target 3681 Cell Phone was activated in the name of a subscriber with the last name "Waugh," a common surname in Defendant's family.  Id. ¶¶ 18-19.  The Target 3681 Cell Phone also showed a common-use pattern with the 6138 Number, having exchanged calls and text messages with numerous telephone numbers in common.  Id. ¶ 20.  Over a period of less than one month, the Target 3681 Cell Phone exchanged 436 calls with Defendant's romantic partner, Individual 1—comprising approximately 16.24% of all telephone calls in that period— and exchanged numerous calls and text messages with Defendant's mother, brother and romantic partner.  Id. ¶ 20.

These facts led the affiant to believe that Defendant was using Target 3681 Cell Phone, and that, based on the affiant's training and experience, he believed that the cell phone's location data would assist law enforcement in identifying Defendant's recent patterns of behavior and showing Defendant's common locations, which would assist in locating and arresting Defendant. Id. ¶¶ 20-25.  The totality of circumstances provided a sufficient basis to find probable cause to issue the Search Warrant.

### c.  The Search Warrant Had Sufficient Particularity And Was Not Overbroad.

The Court respectfully recommends that the District Court find that the Search Warrant had sufficient particularity and was not overbroad.  Defendant argues that the Search Warrant

lacked particularity because it did not establish a nexus between the thing searched and the evidence sought.  See Def. Memo. at 10.  Defendant relies on Oglesby, which is inapposite. Here, the Search Warrant affidavit establishes a nexus between the thing searched i.e., the Target 3681 Cell Phone records, and the thing seized, i.e., location data that would "assist in determining the location of [Defendant]."  See Search Warrant Aff. Attach. B at 3.  The affidavit explains that T-Mobile's records contain "information about the locations of the cellular telephones to which they provide service."  See Search Warrant Aff. ¶ 7.  It explains how real-time E-911 Phase II data can assist in determining the current location of the cell phone and its user.  Id. ¶ 23.  It explains that the historical CSLI would allow "law enforcement officers to identify any recent patterns of behavior showing [Defendant's] common location, which will assist law enforcement to locate and arrest [Defendant]."  Id. ¶ 3.  These details amounted to sufficient particularity.  See United States v. Webb, No. CR19-121-BLG-SPW-1, 2021 U.S. Dist. LEXIS 1009, at *7 (D. Mont. Jan. 4, 2021) ("To hold that a CSLI warrant must describe with more specificity the places where the information sought is located—the cell tower 'pings' from a mobile device—would require law enforcement to include in the warrant application the very information they seek, i.e., Defendant's location.").

Defendant argues that the Search Warrant was overbroad because it covered a 31-day retrospective and 30-day prospective period and should have specified a "more defined date range, time, and data-type restriction."  See Def. Memo. at 12.  Although the Government has not directly responded to this argument, this Court recommends finding that the warrant was appropriately limited in scope, both as to the date range it covered, and as to the data types it sought.

Seeking both historical and real-time location data did not render the warrant overbroad, because both types of data could assist in locating and apprehending a suspect or arrest target, as set forth in the affidavit.  See Search Warrant Aff.  ¶¶ 22-23; Sosunov, 2018 U.S. Dist. LEXIS 76796, at *40 (denying suppression motion where warrant allowed law enforcement to obtain both historical and real-time CSLI to locate and apprehend the defendant).

The Search Warrant's authorization of 31 days of historical data was not overbroad.  T-Mobile records showed that the Target 3681 Cell Phone exchanged numerous calls and text messages with phone numbers associated with Defendant's romantic partner, mother and brother between July 7, 2020 and August 5, 2020.  See Search Warrant Aff. ¶ 20.  The search warrant sought historical CSLI for substantially the same period—from July 7, 2020 to August 7, 2020. See Search Warrant Aff. Attach. B at 1.  The historical CSLI request was thus tailored to the period during which law enforcement believed that Defendant was using the Target 3681 Cell Phone to contact his family members and partner.  Law enforcement could reasonably utilize 30 days of historical CSLI during that period to corroborate its belief that Defendant was the phone's primary user; to identify Defendant's "common locations," including where Defendant was residing; to learn his "recent patterns of behavior" to assist in predicting his whereabouts; and generally helping to "locate and arrest" him.  See Search Warrant Aff. ¶ 22.

While the Search Warrant permitted the Government to access to 30 days of prospective location data, Defendant's arrest occurred only 11 days after the warrant issued.  See Def. Memo. at 5.  Even assuming law enforcement had accessed the full 30 days of prospective data, that time period would not have been overbroad.  The affidavit explains that E-911 Phase II data "provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating the device's signal using data

from several of the provider's cell towers."  See Search Warrant Aff. ¶ 23.  The Government

could reasonably use this "relatively precise" real-time location data to track Defendant's

movement patterns, to plan Defendant's apprehension and to reduce unnecessary risks in

apprehending and arresting Defendant.  See, e.g., United States v. Caraballo, 963 F. Supp. 2d

341, 364 (D. Vt. 2013) ("Cell phone pinging presented a peaceful and apparently lawful means

of quickly discerning Defendant's location in order to maintain at least surveillance over him and

to enhance law enforcement's ability to effect an expeditious and safe arrest."). That the

Government in fact accessed at most 11 days of real-time data further weighs against a finding of

overbreadth.

The Court disagrees with Defendant's argument that the presence of DEA agents, the use

of "drug-sniffing dog," and the execution of a consent to search form after Defendant's arrest

demonstrate that the Search Warrant was a pretextual attempt to investigate other criminal

activity beyond Defendant's alleged illegal reentry.  See Def. Memo. at 14.  There is no evidence

that the search warrant was pretextual because, as discussed, it was based on a valid arrest

warrant and the reasonable belief that Defendant was using the Target 3681 Cell Phone.

Defendant concedes that no property or contraband was seized as a result of the allegedly

overbroad search, which forecloses any attempt to suppress the fruits of that search.  Even

assuming the Government performed a search exceeding the scope of the Search Warrant, arrest

warrant, and consent form, suppression of Defendant's pedigree information would not be the

appropriate remedy.  See Moran, 2014 U.S. Dist. LEXIS 179207, at *19.

### d.  The Arrest Warrant Attenuated The Connection Between The Search Warrant And The Identity Evidence.

Even if the Search Warrant were invalid, which the Court does not believe it is, this Court

respectfully recommends finding that suppression is inappropriate because at least three

exceptions to the exclusionary rule apply.  The attenuation doctrine applies because the pre-existing, valid arrest warrant attenuated the connection between the location-data search and the collection of Defendant's pedigree information.  See Strieff, 579 U.S. 232, 239-41.  The weight of the first attenuation doctrine factor is unclear, because the record does not indicate how much time passed between the allegedly unlawful search and the collection of Defendant's identity information.  See id. at 239.  Even assuming the first factor weighs in favor of suppression, the other two factors weigh strongly against suppression.  As to the second factor, the pre-existing arrest warrant constituted an intervening circumstance that severed the connection between the location-data search and the collection of Defendant's pedigree information incident to the execution of the arrest warrant.  See id. at 240.  Collecting Defendant's pedigree information was a "ministerial act" that was "undisputedly lawful" in light of the valid arrest warrant.  See id.

The third factor—the "purpose and flagrancy" of the Government's alleged misconduct—also strongly weighs against suppression.  This factor reflects the general principle that the exclusionary rule exists solely to deter police misconduct.  Id. at 241.  Suppression would not deter misconduct here because Government did not exhibit a "deliberate, reckless, or grossly negligent" disregard for Defendant's Fourth Amendment rights.  See Davis, 564 U.S at 238 (internal quotation marks omitted).  The Search Warrant affidavit set forth the bases for law enforcement's belief that the Target 3681 Cell Phone's location data would assist in locating Defendant.  As discussed, the 31 days of historical CSLI and 30 days of real-time location data were not overbroad or unreasonable.  Suppressing Defendant's identity information would therefore not serve the purpose of the rule that allegedly made the search unlawful.  See Harris, 495 U.S. at 20-21.  Although the deterrent value of suppressing Defendant's identity information would be low, the cost to society would be high.  As the Eleventh Circuit acknowledged,

"allowing a criminal defendant to use the exclusionary rule to exclude evidence of his identity achieves the same result as would allowing him to suppress the court's jurisdiction over him." United States v. Farias-Gonzalez, 556 F.3d 1181, 1188 (11th Cir. 2009). Considering these factors together, this Court respectfully recommends that the District Court find that Defendant's pedigree information is not suppressible here.

### e.  The Identity Evidence Is Admissible Under The Good-Faith And Inevitable-Discovery Exceptions.

Even if Defendant's identity information were otherwise suppressible, the Court respectfully recommends finding that it would be admissible under the good-faith and inevitable-discovery exceptions. As discussed above, the Search Warrant affidavit set forth in sufficient detail the grounds for the affiant's belief that Defendant was using the Target 3681 Cell Phone and that historical and prospective location data would facilitate location of Defendant. On these facts, a reasonably well-trained officer would not have known that obtaining the location data was unlawful despite the magistrate judge's authorization of the Search Warrant, and the good-faith exception applies. See United States v. Buck, 813 F.2d 588, 592 (2d Cir. 1987).

The inevitable-discovery exception also applies because, as discussed, the unchallenged, valid arrest warrant provided probable cause to arrest Defendant and collect his pedigree information pursuant to that arrest. The Search Warrant affidavit established that law enforcement knew the identity of Defendant's romantic partner Individual 1 and had identified her Facebook account, an IP address associated with her, and a telephone number subscribed in her name. See Search Warrant Aff. ¶¶ 16-17. The Government had also identified telephone numbers associated with Defendant's mother and brother. See id. Although the Government obtained the Search Warrant to ascertain Defendant's movement patterns and location, see id. ¶¶ 22-23, the record suggests that a cell phone location data warrant was not the only way for

32

law enforcement to effect Defendant's arrest. The Government would have inevitably obtained the pedigree information upon Defendant's lawful arrest, whether it first obtained the Search Warrant or not. See United States v. Temple, No. S1-4:15-CR-230-1 JAR (JMB), 2017 U.S. Dist. LEXIS 218638, at *113-14 (E.D. Mo. Oct. 6, 2017), report & recommendation adopted, 2018 U.S. Dist. LEXIS 31290 (E.D. Mo. Feb. 27, 2018) ("The Cell Site Simulator was not used to generate any probable cause for [defendant's] arrest. Accordingly, even if the police lacked lawful authority to use a Cell Site Simulator, and even if the police would not have located [defendant] but for the use of a Cell Site Simulator, [defendant's] arrest would remain lawful and the evidence derived therefrom would not be suppressed."). Because the Government would have inevitably discovered Defendant's identity in the course of his valid arrest, the information is admissible notwithstanding the allegedly unlawful historical and prospective location-data search.

### f. Defendant Is Not Entitled To A Franks Hearing.

This Court respectfully recommends finding that Defendant is not entitled to a Franks hearing. Defendant argues that the Court should not rely on the magistrate judge's finding of probable cause because warrantless surveillance "may have been used" to collect certain information set forth therein, and the warrant omitted that fact. See Def. Memo. at 13. Defendant failed to present any evidence supporting this theory despite having been allowed to conduct discovery. See ECF No. 27 (Defendant's motion seeking records pertaining to the 6138 Number and the Target 3681 Cell Phone in discovery); ECF No. 29 (the parties agreeing on the record that Defendant's motion for discovery was moot).[6] Although there may be more

---

[6] Defendant's counsel states that she once asked the Government in an email exchange how law enforcement first came across the 6138 Number and the Target 3681 Cell Phone and that the Government referred him to the Search Warrant, which Defendant argues does not solve the

information regarding the source of the records pertaining to the 6138 Number and the Target

3681 Cell Phone "than what was included in the [a]ffidavit," and although Defendant "may wish

to cross-examine [the affiant] about these subjects," Defendant's "mere desire to cross-examine

where the magistrate judge did not "is not enough to earn a hearing under Franks." United States

v. Messalas, No. 17-CR-339 (RRM), 2020 U.S. Dist. LEXIS 59598, at *12 (E.D.N.Y. Apr. 4,

2020) (quoting Franks, 438 U.S. at 144)); see United States v. Ray, 541 F. Supp. 3d 355, 386

(S.D.N.Y. 2021) ("All storytelling involves an element of selectivity, and a search warrant

affidavit need not include every piece of information gathered in the course of an investigation.")

(citations & internal quotations omitted).[7]  Defendant has not made the substantial showing

required under the first Franks prong.  The Court has no occasion to consider whether correction

of the affidavit would have negated probable cause, in whole or in part, under the second Franks

prong.  See Franks, 438 U.S. at 171 ("[T]he challenger's attack must be more than conclusory

and must be supported by more than a mere desire to cross examine.  There must be allegations

---

mystery.  See ECF No. 30 at 2 n.1.  The Government notes that subpoenas, law enforcement
databases, human sources, social media platforms and other publicly available means may have
been the source of its information despite Defendant's speculation without proof that it must
have been warrantless surveillance, see ECF No. 33 at 14, or a convincing legal argument that
such surveillance would have been unlawful.

[7] The Court notes for completeness that, if the investigation had been conducted illegally, the
facts derived from it would have to be stricken from the affidavit.  See, e.g., United States v.
Karo, 468 U.S. 705, 719 (1984) (holding that information obtained in violation of the Fourth
Amendment would invalidate search warrant if it proved critical to establishing probable cause);
United States v. Somerlock, No. ELH-19-369, 2022 U.S. Dist. LEXIS 81472, at *11 (D. Md.
May 4, 2022) (discussing United States v. Tate, 524 F.3d 449 (4th Cir. 2008)); United States v.
Epstein, 240 F. Supp. 80, 83 (S.D.N.Y. 1965) (holding that law enforcement may not "with
impunity include impermissible matter in applications for search warrants in the hope that [an
authority] might thereby be persuaded to find probable cause where otherwise none exists or the
issue is in doubt":  "[I]n such a case inclusion of illegally obtained information would require
quashal of a warrant.").  Yet, Defendant has not made any showing that the investigation was
conducted illegally.

of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."). It is only if Defendant makes this preliminary showing—which Defendant has not done here—that the Court can hold a <u>Franks</u> hearing and permit further challenge to the affidavit.

## IV.    Conclusion

For the foregoing reasons, this Court respectfully recommends that the District Court deny Defendant's motion to suppress.

## V.    Objections

A copy of this report and recommendation is being provided to all counsel via ECF. Any written objections must be filed with the Clerk of the Court within fourteen (14) days of filing of this report. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2); <u>see also</u> Fed. R. Crim. P. 45. Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14)-day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); <u>Caidor v. Onondaga Cnty.</u>, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

Dated:  Brooklyn, New York
        October 24, 2022

                                                    _Vera M. Scanlon_
                                            VERA M. SCANLON
                                            United States Magistrate Judge